

ORIGINAL

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

————————————————x
)
UNITED STATES OF AMERICA *ex rel.*      )   Civil Action No. 3:12-CV-47-J-34SBT
[UNDER SEAL],                                              )
)
            Plaintiffs,          )   **COMPLAINT**
)
    v.                              )
)   **FILED UNDER SEAL**
[UNDER SEAL],                                          )   **Pursuant to 31 U.S.C. § 3730(b)(2)**
)
            Defendant.           )
)
)
————————————————x

## COMPLAINT

2012 JAN 17 AM 10: 24
CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE FLORIDA

REC'D FILED
FILED
1/19/12

S-2

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

—————————————————————x

UNITED STATES OF AMERICA, and )
STATE OF FLORIDA, ) Civil Action No. _____
)
  *ex rel.* VERCHETTA WELLS, )
) **COMPLAINT**
                              Plaintiffs, )
)
  v. ) **FILED UNDER SEAL**
) **Pursuant to 31 U.S.C. § 3730(b)(2)**
SEAN ORR, M.D., )
BAPTIST HEALTH SYSTEM, INC., )
BAPTIST NEUROLOGY, INC., )
SOUTHERN BAPTIST HOSPITAL OF FLORIDA, INC., )
BAPTIST PHYSICIAN ENTERPRISE SERVICES, INC., )
)
                              Defendants. )

—————————————————————x

Plaintiff-Relator Verchetta Wells brings this action on behalf of the United States

under the False Claims Act, 31 U.S.C. 31 U.S.C. § 3729, *et seq.* ("Federal FCA"), and the

State of Florida under the Florida False Claims Act, sections 68.081-68.09, Florida

Statutes ("Florida FCA"), and in support thereof states as follows:

### NATURE OF THE CASE

1.     Relator Wells works for a neurology practice associated with Baptist

Medical Center in Jacksonville, Florida.  Wells recently learned that the practice's

leading physician, Dr. Orr, was providing services not reasonable or necessary to scores

or hundreds of patients, including Medicare and Florida Medicaid patients.  Indeed, Dr.

Orr went so far as to intentionally misdiagnose several healthy patients as having serious

neurological diseases and conditions—including multiple sclerosis and brain lesions—so

he could bill for their treatment and prescribe expensive medications.  As a result of Dr.

Orr's fraud, false claims were submitted to government healthcare programs by him and by others for non-payable physician services, hospital services, and medications.

2.      Relator Wells also recently observed that Baptist Medical Center and related entities are actively concealing Dr. Orr's fraud from outsiders, including Medicare and Florida Medicaid. Defendants apparently hope to avoid liability for Dr. Orr's fraud and their own roles in it, at the same time retaining the improper financial benefits that accrued to them. But by failing to report the original false claims and failing to repay the government's money, the Defendants have engaged in new, separate and independent violations of the federal and Florida false claims statutes.

3.      This action seeks damages and penalties against Defendants for submitting, causing and conspiring in the original false claims and false statements, and also for failing to report and repay the resulting overpayments and causing and conspiring in such failure.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over the claims here because they raise federal questions, 28 U.S.C. § 1331; the United States is a plaintiff, 28 U.S.C. § 1345; and the claims assert violations of the Federal and Florida FCAs, 31 U.S.C. § 3732(a), (b).

5.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because all defendants can be found, reside, and transact business in this District and because acts proscribed by 31 U.S.C. § 3729 occurred within this District.

3

6.      Relator Wells is aware of no jurisdictional bars to this action.  Among other things, she has direct and independent knowledge of the facts underlying her claims and voluntarily provided those facts to the United States and to Florida pursuant to requirements of the Federal FCA and Florida FCA.

7.      Venue is proper in the Middle District of Florida under 28 U.S.C. §§ 1391(b) and (c), and 31 U.S.C. § 3732(a), because the Defendants reside in this District; a substantial part of the events or omissions giving rise to the violations of 31 U.S.C. § 3729 alleged in the Complaint occurred in this District; and because Defendants can be found in and transact business within this District.

## PARTIES

8.      The United States is the real plaintiff in interest with respect to the federal claims asserted herein.  The United States operates and/or funds several healthcare programs to which Defendants submitted false statements and/or false claims for payment, including Medicare, Florida Medicaid, TRICARE, and Blue Cross Blue Shield for federal employees (collectively with state programs identified below, "government healthcare programs").

9.      The State of Florida is the real plaintiff in interest with respect to the state claims asserted herein.  The State of Florida operates and/or funds several healthcare programs to which Defendants submitted false statements and/or false claims for payment, including Florida Medicaid and Blue Cross Blue Shield for state employees (collectively with federal programs identified above, "government healthcare programs").

10.     Defendant Baptist Health System, Inc. ("Baptist Health") is a Florida not-for-profit corporation with its administrative offices at 3563 Philips Highway, Building A

4

Suite 101, Jacksonville, Florida.  Baptist Health serves as the umbrella entity for five

Baptist hospitals in the area of Jacksonville, Florida, and numerous other non-profit and

for-profit healthcare-related entities.

11.     Defendant Southern Baptist Hospital of Florida, Inc., d/b/a Baptist

Medical Center ("BMC") is a Florida not-for-profit corporation with its principal facility

at 800 Prudential Drive, Jacksonville, Florida.  BMC is the flagship hospital of Baptist

Health.  As a hospital, BMC submits claims for items and services to the government

healthcare programs, including expensive diagnostic testing for neurological issues done

on the premises of BMC such as MRIs, CT scans and PET scans.

12.     Defendant Baptist Neurology, Inc., d/b/a Baptist Neurology Group

("Baptist Neurology"), is a Florida for-profit corporation with its principal clinical office

located across the street from BMC at 841 Prudential Drive, 10th Floor, Jacksonville,

Florida (the "Downtown" office).  Baptist Neurology provides neurology-related

physician services, consists of about 10 neurologists, and is the largest full-spectrum

neurology practice in the Jacksonville area.  As a physician provider, Baptist Neurology

submits claims for items and services to government healthcare programs.  Additionally,

Baptist Neurology's physicians prescribe items and services, including diagnostic testing

and medications, for which third-parties submit claims to government healthcare

programs.  Baptist Neurology has three satellite offices in the Jacksonville metropolitan

area, those offices being Lakewood, Beaches, and South Jacksonville.

13.     Defendant Baptist Physician Enterprise Services, Inc. ("BPES") is a

Florida for-profit corporation having the same principal address as Baptist Health.

Despite being separately-incorporated, BPES is effectively a department of Baptist

Health through which its executives and staff provide business services to Baptist

Neurology and similar for-profit physician groups in which Baptist Health is a joint

venturer (for example the OBGYN and neurosurgery groups). BPES's business services

include billing, payroll, benefits, and facilities maintenance and improvement for

physician groups, including billing of government healthcare programs.

14.     Relator Wells is employed by Baptist Neurology as a Referral Coordinator

in its Downtown office. She has worked at Baptist Neurology since 2003, apart from a

short layoff in 2009. Wells' primary duties are to obtain pre-authorization from certain

government healthcare programs and third-party payors for diagnostic testing and/or

treatment that Baptist Neurology wants to provide to a patient. As the intermediary

between her neurologists and the payors, Wells is very familiar with neurological

diagnoses, conditions, treatments and medications because she is negotiating approval of

items and services for patients on a daily basis.

15.     Defendant Sean C. Orr, M.D., was a board-certified neurologist and by far

the most visible, prolific and important physician at Baptist Neurology. He began

practicing medicine in 1995 and is currently licensed in the States of Alabama, Florida

(license number ME88500) and Georgia. Dr. Orr provided physician services to patients

through Baptist Neurology and had staff privileges at BMC. He was a founder, officer

and director of Baptist Neurology. He was the senior neurologist, having practiced for

about 10 years, and the other neurologists at the Downtown office were all junior, having

practiced for about five years or less.

16.     All four corporate defendants, namely Baptist Health, BMC, Baptist

Neurology, and BPES (the "Baptist Defendants") are related to each other and share

executives and interlocking directorates.  A. Hugh Greene, Baptist Health's President, CEO and Director, is also an officer and director of BMC and BPES.  John F. Wilbanks, Executive VP and COO of Baptist Health, is an officer and/or director of the other three corporate Defendants.  Harvey Granger, Baptist Health's Corporate Counsel, is the registered agent for all four corporations and an officer of two.  Earl Mally and Leeann Mengel are managers at Baptist Health and also officers and/or directors of both Baptist Neurology and BPES.

17.     The Baptist Defendants hold themselves out to the public as related departments of the same entity.  For example, Baptist Neurology describes itself as "part of the Baptist Health system," and Baptist Health says that "our neuroscience team includes the experienced and subspecialty-trained neurologists of Baptist Neurology Group...."  According to one media report, Baptist Health formed Baptist Neurology. *See,* Jacksonville Financial News & Daily Record, Feb. 10, 2010.  Demonstrating this connection regarding the specific matter of Dr. Orr, Baptist Health's Leeann Mengel told Relator Wells and other office staff that "anytime you come across an upset patient, there may be something Baptist can do to help them monetarily."

18.     Baptist Health had approximately $1.2 billion in revenues in 2011 and an A+ credit rating (reaffirmed by Fitch Ratings on December 2, 2011 based on "BHS's outstanding historical operating profitability, solid liquidity, leading market share, steady volume growth, and strong debt service coverage," as well as "Fitch's belief that BHS will continue to generate strong operating profitability.")  Fitch's analysis may even exclude revenues and profits from Baptist Health's <u>for-profit</u> ventures, including Baptist

Neurology (it is unclear how these ventures are operated consistent with Baptist Health's non-profit status under Florida law and 501(c)(3) status under federal law).

## RELEVANT STATUTES AND REGULATIONS

19.    The Federal FCA and Florida FCA prohibit several variations of fraud on the government. Among other things, the statutes create liability for:

a.  knowingly presenting, and causing to be presented, to an officer and employee of the United States Government, or a Florida agency, false and fraudulent claims for payment and approval (31 U.S.C. § 3729(a)(1)(A); § 68.082(2)(a) Fla. Stat.);

b.  knowingly making, using, and causing to be made and used, false records and statements to get false and fraudulent claims paid and approved by the United States Government, or a Florida agency (31 U.S.C. § 3729(a)(1)(B); § 68.082(2)(b) Fla. Stat.);

c.  knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or a Florida agency, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property (31 U.S.C. § 3729(a)(1)(G); § 68.082(2)(g) Fla. Stat.); and

d.  conspiring to commit the foregoing violations against the United States Government, or conspiring to submit a false or fraudulent claim to a Florida agency or to deceive that agency for the purpose of getting a false or fraudulent claim allowed or paid (31 U.S.C. § 3729(a)(1)(C); § 68.082(2)(c) Fla. Stat.).

20.    The Medicare program is funded and operated by the United States through the Department of Health and Human Services, Centers for Medicare and Medicaid Services to assist elderly persons and others to pay for the cost of healthcare.

For covered patients, the Medicare program pays healthcare providers for goods, services and ancillary items.

21.    The Florida Medicaid program is funded and operated jointly by the United States and by the State of Florida to assist indigent persons and others to pay for the cost of healthcare.  For covered patients, the Florida Medicaid program pays healthcare providers for goods, services and ancillary items.

22.    The TRICARE program is funded and operated by the United States Department of Defense to provide health care to active duty service members, National Guard and Reserve members, retirees, families and survivors.  For covered patients, the TRICARE program pays healthcare providers for goods, services and ancillary items.

23.    The Blue Cross Blue Shield ("BCBS") federal and State of Florida employee programs are funded by the United States and the State of Florida, respectively, and operated by Blue Cross Blue Shield to provide health care to federal and state employees and their families.  For covered patients, the BCBS programs pay healthcare providers for goods, services and ancillary items.

24.    As a condition of payment, government healthcare programs limit provider claims to "items and services...reasonable and necessary for the diagnosis or treatment" of a patient. *See, e.g.,* 42 U.S.C. § 1395y(a)(9), (10), (12); Florida Medicaid Hospital Services Coverage and Limitations Handbook, Ch. 2 at 2-1, *et seq.* (2005).  The programs will not pay for goods or services that are unreasonable or unnecessary for the patient, and claims for payment that are knowingly submitted to government healthcare programs for such goods and services are considered false claims within the meaning of the Federal FCA and/or Florida FCA.

9

25.     Government healthcare programs require providers to timely report and return overpayments. *See, e.g.,* Section 6402(a) of the Patient Protection and Affordable Care Act, enacted on March 23, 2010, codified at 42 U.S.C. §1320a-7j(d).  That statute reads in pertinent part:

(d)  REPORTING AND RETURNING OF OVERPAYMENTS.

(1)  IN GENERAL.—If a person has received an overpayment, the person shall—(A) report and return the overpayment to the Secretary, the State, an intermediary, a carrier, or a contractor, as appropriate, at the correct address; and (B) notify the Secretary, State, intermediary, carrier, or contractor to whom the overpayment was returned in writing of the reason for the overpayment.

26.     "Overpayment" is defined as "any funds that a person receives or retains under title XVIII (Medicare) or title XIX (Medicaid) to which the person, after applicable reconciliation, is not entitled under such title."  42 U.S.C. §1320a-7j(d)(4)(B).  Where the overpayment results from an individual claim for payment, as opposed to an overpayment resulting from an annual cost report, the provider must report and return the overpayment within 60 days.  The statute explicitly makes reporting and repaying an overpayment an "obligation" to the government for purposes of § 3729(a)(1)(G) of the Federal FCA, and failure to comply gives rise to liability thereunder.  *See* 42 U.S.C. §1320a-7j(d)(3).

## FACTUAL ALLEGATIONS

### Dr. Orr's Neurology Practice

27.     Neurology is a medical specialty that deals with disorders of the nervous system.  Such disorders include Alzheimer's disease and dementia; epilepsy and seizures, migraines and severe headaches, multiple sclerosis, Parkinson's disease, and stroke. Diagnosis and treatment of neurological conditions often involves extensive, costly and ongoing testing, including angiograms, CT scans, electroencephalograms ("EEGs"),

10

magnetic resonance imaging ("MRIs"), positron emission tomography ("PET scans"), and ultrasound imaging. Treatment of neurological conditions also often involves costly and ongoing neuropharmaceutical medications for managing or relieving chronic or short-term pain, reducing inflammation, treating infections, stimulating the body's natural defenses, arresting or slowing a disease process, and preventing future episodes. In short, neurological diseases and conditions are generally quite serious, and treatments are generally expensive, ongoing and long-term.

28.     For at least the past six years ("relevant period"), Dr. Orr was a neurologist who provided physician services to patients, including government healthcare program patients, through Baptist Health, BMC, and Baptist Neurology. Dr. Orr was Chief of Neurology at BMC and Medical Director of its Stroke Center. He saw and treated in-patients at BMC's hospital facility and out-patients at Baptist Neurology's clinical facility. Dr. Orr made rounds at BMC several times weekly, and acquired many of his patients through BMC. For example, a patient might arrive at the BMC emergency room suffering a stroke, be diagnosed and/or treated initially by BMC's on-staff neurology hospitalist, and then be referred to Dr. Orr for further diagnosis and treatment. Dr. Orr also provided services at Baptist Neurology's clinic for many hours weekly, diagnosing and/or treating patients who were not hospitalized.

29.     Dr. Orr was prominent in local media, periodically appearing on a local television show in Jacksonville and serving as the team neurologist for the NFL's Jacksonville Jaguars. He was also a very aggressive businessman and styled himself a visionary in neuroscience and its business applications. For example, on October 2, 2006, he incorporated Neurologistics, Inc., a Florida for-profit company, for the purpose

11

of "consulting" on such subjects as "neuronanotechnology, neurobionics,

neurocybernetics, neuronutrition, neuroprotection, neuroregeneration, neuroenhancement,

and augmented reality." It is unclear whether Dr. Orr's company was a legitimate side-

business, or whether it was simply a conduit for improper remuneration from

neuropharmaceutical companies or others for favored treatment by Dr. Orr in his

neurology practice.

30.    Dr. Orr had serious conflicts of interest that could be reasonably expected

to compromise his objectivity regarding patient care. For example, Dr. Orr or his

company Neurologistics was frequently hired for paid speaking engagements by

neuropharmaceutical companies. He also held corporate positions at

neuropharmaceutical companies, for example he was on the board of directors and

scientific advisory board of Sinapis Pharma, Inc., and on the medical and scientific

advisory board Stem Cell Therapy International, Inc. Dr. Orr also frequently met with

neuropharmaceutical representatives and regularly accepted their gifts of expensive wine

and other items for personal use and enjoyment.

31.    Indeed, Dr. Orr had a reputation among his colleagues and co-workers for

over-testing patients. For example, Dr. Orr routinely ordered expensive MRI tests, CT

scans, PET scans, ultrasound imaging, and other testing, and tended to order more tests

per patient than any other neurologist in the practice. Some types of tests were done at

BMC, for example MRIs, while others were done at Baptist Neurology's own testing

center, for example simpler tests like EEGs. Dr. Orr was particularly eager to order tests

that he could perform and bill himself, including lumbar punctures (spinal taps) and skin

biopsies. For example, Dr. Orr performed several of these procedures weekly, even

daily, while other neurologists in the Downtown office rarely did so at all. Now that Dr.
Orr no longer practices at Baptist Neurology, very few of the procedures occur in the
Downtown office.

32.     Despite routinely over-testing patients, Dr. Orr tended to pay less attention
to the results than other neurologists in the group. In other words, he was quick to
diagnose patients with severe diseases and conditions on scant evidence and begin
treatment immediately. Relator Wells had the impression that the other neurologists felt
Dr. Orr was reckless in his diagnoses and that he jumped to conclusions, always in the
direction of illness and never the direction of good health.

33.     Dr. Orr also had a reputation among his colleagues and co-workers for
over-treating patients once diagnosed. For example, only two neurologists in the
Downtown office would inject Botox, Dr. Orr and Dr. Asad, and the former had twice the
number of patients for whom he prescribed Botox. Dr. Orr was not only much more
willing to prescribe Botox injections, he also prescribed higher doses. One drug
representative told Relator Wells that Baptist Neurology was one of the leading
prescribers in the entire State of Florida for medications such as Botox, Acthar, and
Tysabri, and that Dr. Orr was by far the leading prescriber at Baptist Neurology. The
drug representative for Botox told Wells that she dropped from 6th place in sales in the
company to 66th place after Dr. Orr was placed on leave, and that Baptist Neurology had
been the top prescribing office in north Florida and one of the top few in the entire state.
The drug representative told Wells that the Downtown office alone of Baptist Neurology
had been prescribing $50,000 to $70,000 in Botox each month, but that Dr. Orr's abrupt
departure cut the volume purchased to a fraction of its previous level.

34.     Each injection of Botox cost several hundred dollars, but Dr. Orr over-prescribed even more expensive medications as well, for example he liberally prescribed treatments for multiple sclerosis that cost approximately $10,000 monthly. Baptist Health was well aware of Dr. Orr's habit of over-prescribing; on September 28, 2011, Relator Wells was told she must attend a meeting on September 30 demanded of Baptist Neurology by Rick Toney, the Accounting Manager at Baptist Health, to explain why Toney was seeing such astronomical numbers for Botox costs and how that related to the group's income. Curiously, the meeting was cancelled the very next day, September 29, and to Wells' knowledge the meeting never subsequently occurred, or if it did, staff of Baptist Neurology were not included.

35.     Dr. Orr also routinely pressured his associate providers ("APs", including both physicians assistants and nurse practitioners) to belatedly change their patient evaluations to "support" more testing or treatment, or simply changed their assessments himself. For example, Wells frequently overheard Dr. Orr instructing APs to change or supplement their notes for that purpose, and Wells also frequently saw Dr. Orr adding his own writing to patient evaluations for that purpose even though he had been nowhere near the patient when the evaluation was done by an AP. On one occasion, Dr. Orr asked Relator Wells to obtain pre-authorization so he could inject a certain patient with Botox. Wells told him that based on her experience, the carrier would deny coverage because the patient did not meet the necessary criteria. Dr. Orr asked Wells to give the medical file to Ramona Burns, the advanced registered nurse practitioner who had done the patient's evaluation several days earlier, and to ask Burns to change her notes to satisfy the

coverage criteria. Burns refused, telling Wells it was illegal, and Dr. Orr dropped the matter when Wells relayed that to him although he denied it was illegal.

36.    Unnecessary testing and unnecessary prescribing of medications were not the only means by which Dr. Orr inflated his revenues and profits; he also generally scheduled patients for uncommonly frequent office visits, sometimes weekly for long periods of time. Dr. Orr used APs freely and far more than other neurologists in the group, in addition to seeing patients himself. He developed a staggeringly large practice of between 2,500 and 3,500 active patients. Neurological diseases, conditions and treatments are typically ongoing and, unlike many other medical specialties, neurologists tend to have "patients for life."

37.    Relator Wells' impression was that the other physicians at Baptist Neurology's Downtown office were concerned about Dr. Orr's aggressive patient care, but that leaving the practice was the answer rather than confronting Dr. Orr. Dr. Amy Jarvis had been in the group but departed for a less prestigious, and likely less remunerative, full-time neurology hospitalist position at BMC; Dr. Syed Asad left papers on a facsimile machine that led Wells to believe he was investigating other employment opportunities; and Dr. Georgia Gianakakos was similarly overheard by Wells on her cell phone in a hallway, quietly saying "...but I can't get out of my employment contract." After Dr. Orr's disappearance from the Downtown office, Dr. Jarvis rejoined Baptist Neurology.

38.    Several hundred of Dr. Orr's patients were covered by Medicare, Florida Medicaid, TRICARE, or the Blue Cross Blue Shield government employee programs, whether as the primary or secondary carriers, and his activities generated claims for

payment submitted to those programs, including under Part A by BMC for in-patient items and services; under Part B by Baptist Neurology and/or Dr. Orr for out-patient items and services; and under Part D by those filling treatment and medication prescriptions.  Hundreds or thousands of false and fraudulent claims for payment and false statements were submitted to government healthcare programs for unreasonable and unnecessary items and services arising from Dr. Orr's activities.  Relator Wells personally obtained pre-authorizations from government healthcare programs for certain treatments by Dr. Orr, including for example pre-authorizations from TRICARE for any Botox injections, and has personal knowledge that he ultimately performed and billed those services.  Additionally, she has personal knowledge that Dr. Orr submitted claims for payment to programs such as Medicare that generally followed "bright line" coverage rules for medications like Botox and thus needed no pre-authorization.

### False Diagnoses by Dr. Orr and Cover-Up by Baptist

39.     On Friday October 7, 2011, Relator Wells and all others in the Downtown office of Baptist Neurology were abruptly advised that they would be sent home early that afternoon, which was highly unusual, and management's explanation that "computers would be down" and that they needed to "take inventory related to an upcoming move" made no sense to Wells. Her request to stay to do simple paperwork was denied, and she and all others but management left the office around 2:30 p.m.

40.     On the following Monday, October 10, 2011, Relator Wells went to work as usual but found the main door of Baptist Neurology locked and a note stating the office would be closed to patients until noon.  She was admitted by building maintenance staff, learning at that time the locks had been changed, and was eventually ushered by

16

management into an employee meeting in the lobby. There, Wells and other staff were addressed by Stephanie Crawford (the Baptist Health supervisor of their Baptist Neurology office manager) and Leeann Mengel (RN, MBA, and medical billing expert who was a high-level manager of Baptist Health and VP of both Baptist Neurology and BPES). The meeting was very short, with Crawford and Mengel telling staff that Dr. Orr was on leave until further notice for unspecified reasons, and that the matter was confidential and any person caught discussing it either inside or outside the office would be fired.

41.     What followed was a week of secretive and intense activity on the part of the Baptist Defendants. That first day, Monday, several officials were in and out of Dr. Orr's closed-door office all day. Those officials included Baptist Health's Stephanie Crawford and Leeann Mengel (see above), as well as Stephen Lee, VP of Operations for BMC; a registered nurse from Baptist Health's Risk Management department; Connie Goode from the human resources department of Baptist Health; and an attorney from Baptist Health's legal department. Crawford had historically visited the office of Baptist Neurology about 2-3 times weekly to meet with its office manager, who reported to Crawford, but none of the other four persons had previously frequented (or even visited) the offices of Baptist Neurology, leading Wells to conclude that the group was combing through Dr. Orr's records and discussing them on an ongoing basis.

42.     On the second day, Tuesday, the Baptist Health personnel occupying Dr. Orr's office presented a list of approximately 60-100 of Dr. Orr's patients to Baptist Neurology staff and had those medical files brought to Dr. Orr's office for review by the Baptist Health personnel. The average file was 2-3 inches thick, but some were as

voluminous as 15 inches or more, each consisting of evaluations, test results, progress notes, etc. It appeared to Relator Wells that the files were primarily those of multiple sclerosis patients. To Relator Wells and other staff, it was clear that a crisis involving Dr. Orr had occurred and that high-level executives of Baptist Health and BMC were in charge of the response and not Baptist Neurology.

43.     This review of Dr. Orr's files continued for the remainder of the week. From Tuesday through Friday, the Baptist Health personnel were joined by at least one neurologist, specifically Dr. Jarvis who had been with Baptist Neurology but left to become BMC's neurology hospitalist. Dr. Jarvis may have been joined in the review at times by Drs. Asad and Gianakakos.

44.     The review of Dr. Orr's files continued for several weeks and grew into the hundreds of files. Some of them were sent to Dr. Thomas Snyder, Chief of Neurology at Baptist Health's BMC-Beaches facility and Dr. Orr's fellow director on the board of Baptist Neurology.

45.     As the review of files progressed, it confirmed that Dr. Orr had unnecessary tested, too hastily diagnosed, and unnecessarily treated many of his patients. Moreover, the review found that several healthy patients had been intentionally and falsely diagnosed with serious neurological diseases and conditions by Dr. Orr. For example, Dr. Snyder alone found that Dr. Orr had falsely diagnosed several patients with brain lesions or other encephalopathy, and that at least five (5) patients had been falsely diagnosed with multiple sclerosis. Not only had these patients lived unnecessarily with the trauma of these diagnoses, but they had also suffered the physical and financial costs of taking treatments and medications that could have side-effects and potentially cause

18

harm. One falsely-diagnosed patient filed bankruptcy because the resulting medications were so expensive, and another was institutionalized at a psychiatric facility. Others stood to lose disability designations that had been based on the false diagnoses. Regrettably, some of the patients falsely diagnosed by Dr. Orr had been taking unnecessary treatments and medications for several years.

46.     Based on re-evaluations of the paper files, the Baptist Defendants started the process of scheduling hundreds of Dr. Orr's patients for in-person physical re-evaluations by Baptist Neurology's other physicians. One staff member alone contacted 10-12 patients daily for purposes of scheduling these re-evaluations. Of the re-evaluations that have occurred so far, the other neurologists have been extremely cautious yet have often discontinued medications and treatments for lack of any basis to continue. For example, with respect to one group of about 20 Botox patients who were re-evaluated, the other neurologists continued prescriptions for only two of them. As alleged above, Dr. Orr was a prolific prescriber of that drug, often using it for dystonia or migraines.

47.     Despite scheduling widespread re-evaluations, Baptist Neurology was very circumspect with Dr. Orr's patients. They were not advised of the reason for Dr. Orr's leave, the reason for their transfer to another physician, or the specific reason for their re-evaluation. Many of the patients were thoroughly confused and uncertain whether to continue their medications and treatments or not, and Baptist Neurology was and continues to be so backlogged with re-evaluations (which the Baptist Defendants prefer to keep "in house" for secrecy) that no physicians are available to help patients on

a timely basis. In short, ongoing efforts by the Baptist Defendants to conceal Dr. Orr's misconduct come at the great expense of affected patients.

48.     The Baptist Defendants have successfully transferred some of Dr. Orr's re-evaluated patients to other physicians within Baptist Neurology, mainly Drs. Snyder and Jarvis, but others have left the practice altogether. Of the departing patients, it is unclear how many transferred to other neurology practices and how many simply realized they needed no neurological services or treatments. Similarly, of the remainder of Dr. Orr's patients, some have been transferred to physicians within Baptist Neurology and others have left, but hundreds more remain in limbo in the re-evaluation queue.

49.     As a result of Dr. Orr's false diagnoses and over-treatment of government healthcare program patients, hundreds or thousands of false and fraudulent claims for payment and false and fraudulent statements were submitted by Dr. Orr and the Baptist Defendants to those government healthcare programs under Parts A, B and D. The United States and the State of Florida were not aware that the claims and statements were false and fraudulent, and would not have paid the claims if they had known. False claims for Medicare payment were submitted to First Coast Service Options, Inc. as Fiscal Intermediary and Medicare Administrative Contractor for Florida. False claims for Florida Medicaid payment were submitted to HP Enterprise Services as Florida's designated Medicaid Fiscal Agent. Government healthcare programs ultimately paid the claims of Dr. Orr and the Baptist Defendants with government funds, and the Baptist Defendants have not reported the claims to those programs as overpayments, nor repaid the improperly obtained government money. The 60-day period for self-reporting has expired.

## COUNT I

### VIOLATIONS OF FEDERAL FCA, 31 U.S.C § 3729

50.     Relator Verchetta Wells, on behalf of the United States, realleges and incorporates by reference all preceding paragraphs of this Complaint.

51.     During the relevant period, Dr. Orr and the Baptist Defendants presented numerous claims for payment and statements to government healthcare programs operated by the United States.

52.     For the reasons alleged herein, many of these claims were knowingly false and fraudulent within the meaning of the Federal FCA.  More specifically:

a.  Dr. Orr, Baptist Neurology, Baptist Health, BMC and/or BPES knowingly presented, and caused to be presented, to an officer and employee of the United States Government false and fraudulent claims for payment and approval (31 U.S.C. § 3729(a)(1)(A));

b.  Dr. Orr, Baptist Neurology, Baptist Health, BMC and/or BPES knowingly made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the United States Government (31 U.S.C. § 3729(a)(1)(B));

c.  Dr. Orr, Baptist Neurology, Baptist Health, BMC and/or BPES knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property (31 U.S.C. § 3729(a)(1)(G)); and

d.  Dr. Orr, Baptist Neurology, Baptist Health, BMC and/or BPES conspired to commit the foregoing violations against the United States Government (31 U.S.C. § 3729(a)(1)(C)).

53.     Each Defendant had actual knowledge of the falsity of these claims, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the Federal FCA.

54.     The United States suffered damages as a result of false claims by Defendants and is entitled to recover its losses and obtain other relief available under the Federal FCA.

## COUNT II

### VIOLATIONS OF FLORIDA FCA,
### SECTIONS 68.081-68.09, FLA. STAT.

55.     Relator Verchetta Wells, on behalf of the State of Florida, realleges and incorporates by reference all preceding paragraphs of this Complaint.

56.     During the relevant period, Dr. Orr and the Baptist Defendants presented numerous claims for payment and statements to Florida Medicaid, a government healthcare program jointly operated by the State of Florida and the United States.

57.     For the reasons alleged herein, many of these claims were knowingly false and fraudulent within the meaning of the Florida FCA.  More specifically:

a.  Dr. Orr, Baptist Neurology, Baptist Health, BMC and/or BPES knowingly presented, and caused to be presented to a Florida agency false and fraudulent claims for payment and approval (§ 68.082(2)(a) Fla. Stat.);

22

b. Dr. Orr, Baptist Neurology, Baptist Health, BMC and/or BPES knowingly made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by a Florida agency (§ 68.082(2)(b) Fla. Stat.);

c. Dr. Orr, Baptist Neurology, Baptist Health, BMC and/or BPES knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to a Florida agency, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property (§ 68.082(2)(g) Fla. Stat.); and

d. Dr. Orr, Baptist Neurology, Baptist Health, BMC and/or BPES conspired to submit a false or fraudulent claim to a Florida agency or to deceive that agency for the purpose of getting a false or fraudulent claim allowed or paid (§ 68.082(2)(c) Fla. Stat.).

58.     Each Defendant had actual knowledge of the falsity of these claims, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the Florida FCA.

59.     The State of Florida suffered damages as a result of false claims by Defendants and is entitled to recover its losses and obtain other relief available under the Florida FCA.

## PRAYER FOR RELIEF

WHEREFORE, Relator Verchetta Wells, on behalf of the United States and the State of Florida, prays for judgment pursuant to the Federal FCA and Florida FCA as follows:

1.      For judgment against each Defendant and in favor of the United States and the State of Florida for treble damages, expenses, attorneys' fees, and costs in connection with this action;

2.      For judgment against each Defendant and in favor of the United States and the State of Florida for civil penalties in statutorily-determined amounts for each false claim;

3.      For an award to Relator Verchetta Wells for the maximum *qui tam* relator's portion permitted under the Federal and Florida FCAs; and

4.      For an award to Relator Verchetta Wells for her reasonable expenses, attorneys' fees, and costs incurred in connection with this action.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

DATED:       January 14, 2012          Respectfully submitted,

                                                       **MILBERG LLP**

                                                       By: _____

Christopher S. Polaszek
Florida Bar Number: 0116866
201 North Franklin Street, Suite 3200
Tampa, Florida 33602
Tel: 813.367.5713
Fax: 561.892.8164
cpolaszek@milberg.com

Kirk E. Chapman
kchapman@milberg.com
Ross B. Brooks
rbrooks@milberg.com
Rolando G. Marquez
rmarquez@milberg.com
**MILBERG LLP**
One Pennsylvania Plaza
New York, New York 10119-0165
Tel: 212.594.5300
Fax: 212.868.1229

George Pressly
gpressly@presslylaw.com
Konstantine Kyros
kon@kyroslaw.com
**KYROS & PRESSLY LLP**
60 State Street, Suite 700
Boston, Massachusetts 02109
Tel: 603.320.7030

Sherman Marek
smarek@marek-law.com
**MAREK LAW OFFICE, PC**
1055 Bryn Mawr Ave. #F100
Chicago, IL 60660
Tel: 312.805.0244

*Attorneys for Plaintiff and Relator Verchetta Wells*

25